POSNER, Circuit Judge,
concurring.
I write separately merely to remind the district judges of this circuit of the importance of careful consideration of the wisdom of imposing de facto life sentences. If the defendant in this case does not die in the next 50 years he will be 96 years old when released (though “only” 89 or 90 if he receives the maximum good-time credits that he would earn if his behavior in prison proves to be exemplary). See 18 U.S.C. § 3624(b); Barber v. Thomas, — U.S. -, 130 S.Ct. 2499, 177 L.Ed.2d 1 (2010); U.S. Dept, of Justice, “Legal Resource Guide to the Federal Bureau of Prisons” 13-14 (2008), www.bop.gov/news/ PDFs/legaLguide.pdf; Rob Ruth, “Calculating Federal Good Time Credit: How the BOP Turns 54 Days Into 47,” CJA News Blog (Dec. 29, 2010), http://madison attorney.com/cjablog'?p=95; Families Against Mandatory Mínimums, “Frequently Asked Questions about Federal Good Time Credit,” www.famm.org/Repository/ Files/FINAL_GoodJTime_FAQs_10.21. 08% 5B1% 5D.pfd. (All websites cited in this opinion were visited on Dec. 3, 2012.) Maybe 50 years from now 96 will be middle-aged rather than elderly, but on the basis of existing medical knowledge we must assume that in all likelihood the de *1003 fendant will be dead before his prison term expires.
Federal imprisonment is expensive to the government; the average expense of maintaining a federal prisoner for a year is between $25,000 and $80,000, Notice, Bureau of Prisons, 76 Fed. Reg. 57081 (Sept. 15, 2011), www.gpo.gov/fdsys/pkg/FR-2011-09-15/pdf/2011-23618.pdf, and the expense rises steeply with the prisoner’s age because the medical component of a prisoner’s expense will rise with his age, especially if he is still alive in his 70s (not to mention his 80s or 90s). It has been estimated that an elderly prisoner costs the prison system between $60,000 and $70,000 a year. Kelly Por celia, Note, “The Past Coming Back to Haunt Them: The Prosecution and Sentencing of Once Deadly But Now Elderly Criminals,” 81 St. John’s L. Rev. 369, 383 (2007).
That is not a net social cost, because if free these elderly prisoners would in all likelihood receive Medicare and maybe Medicaid benefits to cover their medical expenses. But if freed before they became elderly, and employed, they would have contributed to the Medicare and Medicaid programs through payroll taxes — which is a reminder of an additional social cost of imprisonment: the loss of whatever income the prisoner might lawfully have earned had he been free, income reflecting his contribution to society through lawful employment.
The social costs of imprisonment should in principle be compared with the benefits of imprisonment to the society, consisting mainly of deterrence and incapacitation. A sentencing judge should therefore consider the incremental deterrent and inca-pacitative effects of a very long sentence compared to a somewhat shorter one. An impressive body of economic research (summarized and extended in David S. Abrams, “The Imprisoner’s Dilemma: A Cost Benefit Approach to Incarceration,” forthcoming in Iowa Law Review) finds for example that forgoing imprisonment as punishment of criminals whose crimes inflict little harm may save more in costs of imprisonment than the cost in increased crime that it creates. Ours is not a “little crime” case, and not even the defendant suggests that probation would be an appropriate punishment. But it is a lifetime imprisonment case, and the implications for cost, incapacitation, and deterrence create grounds for questioning that length of sentence.
For suppose the defendant had been sentenced not to 50 years in prison but to 30 years. He would then be 76 years old when released (slightly younger if he had earned the maximum good-time credits). How likely would he be to commit further crimes at that age? As we noted in United States v. Johnson, 685 F.3d 660, 661 (7th Cir.2012), although persons 65 and older are 13 percent of the population, they accounted for only seven-tenths of one percent of arrests in 2010. Last year 1,451 men ages 65 and older were arrested for sex offenses (excluding forcible rape and prostitution), which was less than 3 percent of the total number of arrests of male sex offenders that year. FBI, Uniform Crime Reports: Crime in the United States 2011, www.fbi.gov/about-us/cjis/ucr/ crime-in-the-u.s/2011/crime-in-the-u.s-2011/tables/table-39. Only 1.1 percent of perpetrators of all forms of crime against children are between 70 and 75 years old and 1.3 percent between 60 and 69. U.S. Dep’t of Health & Human Services, Children’s Bureau, “Child Maltreatment 2010” 76 (2010), http://archive.acf.hhs.gov/ programs/cb/pubs/cml0/cml0.pdf. How many can there be who are older than 75?
It is true that sex offenders are more likely to recidivate than other criminals, Virginia M. Kendall and T. Markus Funk, Child Exploitation and Trafficking: Ex *1004 amining the Global Challenges and U.S. Responses 310 (2012), because their criminal behavior is for the most part compulsive rather than opportunistic. But capacity and desire to engage in sexual activity diminish in old age. Moreover, when released, a sexual criminal is subject to registration and notification requirements that reduce access to potential victims. Id. at 320.
As for the benefits of a lifetime sentence in deterring other sex criminals, how likely is it that if told that if apprehended and convicted he would be sentenced to 50 years in prison the defendant would not have committed the crimes for which he’s been convicted, but if told he faced a sentence of “only” 30 years he would have gone ahead and committed them? That he would have deemed the expected punishment cost (roughly, the cost of being imprisoned for 30 years times the probability of being apprehended and convicted) less than the benefit he would derive, in satisfaction of his sadistic sexual urges, from committing these crimes? (There is no indication that he has a propensity to commit other crimes.) Probably he had no idea what his punishment was likely to be if he was caught, for the Justice Department does little to publicize punishment levels for the various federal crimes.
Sentencing judges should try to be realistic about the incremental deterrent effect of extremely long sentences. Even unsophisticated persons tend to discount future costs and benefits. Most people prefer to receive a dollar today than a dollar a year from now, even if that future dollar is certain, and likewise they prefer to pay a dollar a year from now than today. If you face a 50 year sentence rather than a 25 year sentence for some crime you’re thinking of committing, you consider it heavier punishment but probably not twice as heavy; every year added to the prospective sentence has a lesser deterrent effect than the preceding year of the sentence because it is added on at the end.
Sentencing judges are not required to engage in cost-benefit analyses of optimal sentencing severity with discounting to present value. Such analyses would involve enormous guesswork because of the difficulty of assessing key variables, including one variable that I haven’t even mentioned, because I can’t imagine how it could be quantified in even the roughest way — the retributive value of criminal punishment. By that I mean the effect of punishment in assuaging the indignation that serious crime arouses and in providing a form of nonfinancial compensation to the victims.
But virtually all sentencing, within the usually broad statutory ranges — the minimum sentence that the judge could have imposed in this case, by making the sentences on all four counts run concurrently, as he could have done, would have been 15 years, 18 U.S.C. § 2251(e), and the maximum sentence, by making them all run consecutively, as he could also have done, would have been 120 years — involves guesswork. I am merely suggesting that the cost of imprisonment of very elderly prisoners, the likelihood of recidivism by them, and the modest incremental deterrent effect of substituting a superlong sentence for a merely very long sentence, should figure in the judge’s sentencing decision.